**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOSEPH JOHNSON,

                              Plaintiff,

        - v -                                                   Civ. No. 6:02-CV-0630
                                                                        (FJS/RFT)

JO ANNE B. BARNHART, Commissioner of
Social Security,

                              Defendant.


**APPEARANCES:**                                  **OF COUNSEL:**

OLINSKY DiMARTINO LAW FIRM             HOWARD OLINSKY, ESQ.
Attorney for Plaintiff
186 West First Street
Historic First National Bank
Oswego, New York 13126


HON. GLENN T. SUDDABY                   WILLIAM H. PEASE, ESQ.
United States Attorney for the              Assistant United States Attorney
Northern District of New York
Attorney for the Defendant
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261


**RANDOLPH F. TREECE**
**UNITED STATES MAGISTRATE JUDGE**


**REPORT-RECOMMENDATION AND ORDER**

        In this action, Plaintiff Joseph Johnson moves pursuant to 42 U.S.C. § 405(g) for review of a

decision by the Commissioner of Social Security denying his application for disability benefits.[1]

Based upon the following discussion, this Court recommends that the Commissioner's decision

denying Social Security benefits be reversed and the case be remanded for further development of

_____

        [1] This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed
when appealing a denial of Social Security benefits.  Both parties have filed briefs, though oral argument was not heard.
Dkt. Nos. 8 & 9.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(d).

the record.

## I.  BACKGROUND

### A.  Facts

The facts set forth in Johnson's brief under the heading "Statement of Facts" (Dkt. No. 8 at p. 2) are adopted.[2]

### B.  Procedural History

On January 19, 2000, Johnson protectively filed an application for disability benefits based upon his back impairments asserting a disability onset date of November 4, 1996.  Dkt. No. 7, Administrative Transcript [hereinafter "Tr."] at pp. 54-56 & 60-69.  That application was denied initially and on reconsideration.  Tr. at pp. 35-42.  On December 19, 2000, a  hearing was held before Administrative Law Judge ("ALJ") Joseph Medicis, Jr., (Tr. at pp. 22-34), and on April 23, 2001, ALJ Medicis issued an unfavorable decision against Johnson (Tr. at pp. 13-20).  The Appeals Council subsequently denied his request for review on April 12, 2002, thus rendering the ALJ's decision the final determination of the Commissioner.  Tr. at pp. 4-5.  Exhausting all his options for review through the Social Security Administration's tribunals, Plaintiff now brings this appeal.

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), the standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings and that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*,

---

[2] The Commissioner incorporated into her Brief the Plaintiff's summary of the medical and other evidence with the exception of any inferences or conclusions asserted therein.  Dkt. No. 9 at p. 3.

*Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, "[s]ubstantial evidence is more than a mere scintilla[,]" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g).  Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed.  *Johnson v. Bowen*, 817 F.2d at 986.

### B.  Determination of Disability

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy.  *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential analysis set forth in the Social Security Administration Regulations.  20 C.F.R. §

404.1520.[3]  At Step One the Commissioner "considers whether the claimant is currently engaged in substantial gainful activity."  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations.  *Id*. at § 404.1520(d).  The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675 F.2d at 467.  Where the claimant has such an impairment, the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity.  *Id*.  If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity ("RFC")[4] to perform his or her past relevant work despite the existence of severe impairments.  20 C.F.R. §§ 404.1520(e)-(f).  If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy.  *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 404.1520(g).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s)

---

[3] Unless otherwise noted, all citations to the Social Security Administration's Regulations, set forth in Title 20 of the Code of Federal Regulations, are to the 2005 version.

[4] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).

prevents a return to previous employment (Steps One through Four).  *Berry v. Schweiker*, 675 F.2d

at 467.  If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five

to establish, with specific reference to medical evidence, that the claimant's physical and/or mental

impairment(s) are not of such severity as to prevent him or her from performing work that is

available within the national economy.  *Id*.; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of*

*Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990).  In making this showing in Step Five, the

claimant's RFC must be considered along with other vocational factors such as age, education, past

work experience, and transferability of skills.  20 C.F.R. § 404.1520(g); *see also New York v.*

*Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C.  ALJ Medicis's Findings

Johnson was the only witness to testify at the hearing.  Tr. at pp. 22-34.  In addition to such

testimony, the ALJ had a number of Johnson's medical records consisting of treatment reports and

opinions from various treating and/or Agency examining/non-examining physicians, including, 1)

Glenn B. Axelrod, M.D.; 2) Saad G. Sobhy, M.D.; 3) Stephen C. Robinson, M.D.;  4) Reinhard E.

Bothe, M.D.; 5) Kalyani Ganesh, M.D.; 6) Sury Putcha, M.D.; 7) William Ferraraccio, M.D.; and 8)

C.R. Manley, M.D.  Tr. at 102-89.[5]

In his written opinion, ALJ Medicis stated that Johnson met the special earnings

requirement set forth in the Regulations through the date of the ALJ's decision.  Tr. at p. 14.  Using

the Five-Step disability evaluation, ALJ Medicis found that 1) Johnson had not engaged in any

substantial gainful activity since his alleged onset date of November 4, 1996; 2) Johnson had a

medically determinable and severe impairment, namely degenerative disc disease at L5-S1; 3) his

---

[5] According to the Administrative Transcript, additional medical records from Drs. Robinson and Ferraraccio were received at and subsequent to the hearing.  Tr. at pp. 3 & 184-89.

severe impairment did not meet nor medically equal any of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) Johnson possessed the residual functional capacity to perform light work and, accordingly, cannot perform his past relevant work as a correction officer, but; 5) given his functional capacity, he nevertheless retained the ability to perform work available in the national economy. Tr. at pp. 19-20. After reviewing the administrative transcript, the Court finds that the ALJ did not apply the correct legal standards in rendering his decision. Accordingly, as explained more fully below, the Court recommends that the Commissioner's decision denying Johnson disability benefits should not be upheld.

### D.  Johnson's Contentions

Generally, Plaintiff objects to the ALJ's findings at each Step except for the finding at Step One, wherein ALJ Medicis determined Johnson had not engaged in substantial gainful activity. Specifically, Plaintiff claims the ALJ made the following errors: 1) at Step Two, the ALJ mis-characterized Plaintiff's lower back diagnosis, omitted Plaintiff's cubital tunnel syndrome from the evaluation, and failed to consider the impact of Plaintiff's impairments in combination; 2) at Step Three, the ALJ failed to find Plaintiff's impairments to be of the severity that meets or equals the Listing at § 1.04, Disorders of the Spine; 3) the ALJ failed to apply the Treating Physician Rule and afford Dr. Robinson, and other treating physicians, controlling weight; 4) at Step Four, the ALJ erroneously determined Plaintiff retained a functional capacity to perform the full range of light work; 5) at Step Five, the ALJ erroneously relied on the Medical-Vocational Guidelines when Plaintiff suffers from both exertional and non-exertional impairments; and 6) the ALJ improperly discredited Plaintiff's statements regarding pain and other symptoms. Dkt. No. 8 at pp. 11-24.

### 1.  Severity of Medical Conditions (Step Two)

Johnson contends that, in finding his back impairment severe at Step Two, the ALJ mis-stated the diagnosis of his back impairment, failed to consider the severity of his cubital tunnel syndrome,[6] and generally failed to consider the combined impact of all of his impairments.  Dkt. No. 8 at pp. 11-14.  Plaintiff further contends that these errors "permeated the remainder of the sequential evaluation process and merit reversal."  *Id*. at p. 12.

At Step Two, the ALJ must determine whether an individual has an impairment or combination of impairments that are severe.  20 C.F.R. § 404.1520(c).  The Second Circuit has warned that the Step Two analysis may not do more than "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (quoted in *de Roman v. Barnhart*, 2003 WL 21511160, at *11 (S.D.N.Y. July 2, 2003)).  An impairment is <u>not severe</u> at Step Two if it does not significantly limit a claimant's ability to do basic work activities.  20 C.F.R. § 404.1521(a).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); *see also* Social Security Ruling [hereinafter S.S.R.] 85-28, 1985 WL 56856, at *3-4, *Titles II and XVI: Medical Impairments That Are Not Severe* (S.S.A. 1985).

If a claimant has multiple impairments, the combined effect of all impairments should be considered "without regard as to whether any such impairment, if considered separately, would be

---

[6] Cubital tunnel syndrome is "a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, with pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1628 (28th ed. 1994).

of sufficient severity." 20 C.F.R. § 404.1523; 42 U.S.C. § 423(d)(2)(B); *see also Schulte v. Apfel*,

2000 WL 362025 (W.D.N.Y. Mar. 31, 2000). "A finding of 'not severe' should be made if the

medical evidence establishes only a 'slight abnormality' which would have 'no more than a

minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, 1999 WL 294727, at *5

(E.D.N.Y. Mar. 19, 1999) (quoting S.S.R. 85-28, 1985 WL 56856, at *3, *Titles II and XVI: Medical*

*Impairments That Are Not Severe* (S.S.A. 1985)). Furthermore, a finding that a condition is "not

severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at

the second level of the five-step sequential evaluation process." *Rosario v. Apfel*, 1999 WL

294727, at *5 (citing 20 C.F.R. § 404.1520(c)). If, however, a disability claim "rises above the *de*

*minimis* level, then the further analysis of step three and beyond must be undertaken." *See de*

*Roman v. Barnhart*, 2003 WL 21511160, at *11 (citing *Dixon v. Shalala*, 54 F.3d at 1030).

    In the case at hand, at Step Two, the ALJ determined that Johnson's back impairment,

namely degenerative disc disease in the lumbar spine at L5-S1, was severe. In reciting the relevant

standard, the ALJ stated:

> A medically determinable impairment or combination of impairments is severe if it
> significantly limits an individual's physical or mental ability to do basic work activities
> (20 CFR § 404.1521). The Regulations require that if a severe impairment exists, all
> medically determinable impairments must be considered in the remaining steps of the
> sequential analysis (20 CFR § 404.1523).

Tr. at p. 14.

The Court finds that the ALJ stated the legal standard correctly. After reviewing the diagnostic

evidence, the ALJ stated

> Since the claimant's ability to perform basic work activities would be limited, the
> claimant's impairments are considered severe. The medical evidence indicates that the
> claimant has degenerative disc disease at L5-S1, an impairment that is severe within the
> meaning of the Regulations[.]

Tr. at p. 15.

In making this assessment, the ALJ specifically referred to an x-ray of Johnson's lumbar spine, taken on August 6, 1996, which noted degenerative disc disease at the L5-S1 level.  Tr. at pp. 14 & 104.  The ALJ also referred to two magnetic resonance imagings (MRI) of the lumbar spine.  Tr. at pp. 14-15.  The first MRI, as initially read by Dr. Sobhy, revealed degenerative disc disease at the L5-S1 level with ostephytes.  Tr. at pp. 14 & 105.  A second MRI, taken on April 15, 1998, again revealed degenerative disc disease at the L5-S1 level with an interposed disc bulge between osteophytes.  Tr. at p. 128.  A notation on the April MRI indicated that the "findings are stable from the prior study and have not progressed."  *Id.*  Lastly, in assessing the severity of Johnson's impairments, the ALJ reviewed the examination of Plaintiff's lumbar spine conducted by Sury Putcha, M.D., a state agency physician, on April 6, 2000.  Tr. at p. 15.  Within that report, it was noted that Plaintiff was limited to lifting and carrying twenty (20) pounds occasionally and ten (10) pounds frequently.  Tr. at pp. 15 & 173.  Since Plaintiff's back impairments inhibited basic work activities, the ALJ deemed his back impairments to be severe.

Contrary to Plaintiff's argument, the limitations of basic work activities are the standards by which a severity determination is made and not a specific diagnosis.  20 C.F.R. § 404.1521(a).  The ALJ's determination at Step Two in no way tainted the remainder of the sequential analysis since, as directed by the Regulations, the ALJ determined Johnson had at least one severe impairment, the remainder of his impairments were considered at each subsequent Step, for example, at Step Four in assessing the Plaintiff's RFC.  *See* Tr. at pp. 15-18; 20 C.F.R. § 404.1545(a)(2); *see also* S.S.R. 96-3p, 1996 WL 374181, at * 2, *Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe* (S.S.A. 1996) (noting that the severity determination "requires an **assessment**

**of the functionally limiting effects of an impairment(s**)" (emphasis added)).  While Plaintiff objects to the general characterization of his back disorder, a review of the medical evidence nevertheless reveals that the ALJ's determination of severity in Plaintiff's favor is supported by substantial evidence and that the ALJ applied the correct legal standards.

Next, Johnson contends the ALJ erred in failing to consider Plaintiff's cubital tunnel syndrome.  Again we find that the ALJ committed no error at Step Two.  Johnson injured his left wrist in a car accident in January 1999.  Tr. at p. 136.  Upon initial examination immediately following the accident, Dr. Glenn B. Axelrod diagnosed, in addition to cervical whiplash, a superimposed left wrist sprain.  *Id*.  On February 12, 1999, Dr. Axelrod examined Johnson and noted mild left wrist pain with good motion.  Tr. at p. 138.  In April 1999, Johnson reported occasional numbness in his fourth and fifth fingers of his left hand.  Tr. at p. 140.  Upon examination, Dr. Stephen Robinson noted some hyperesthesia[7] in Johnson's middle and ring fingers of his left hand and a positive Tinel's sign[8] at the left cubital tunnel with paresthesias[9] in the fourth and fifth fingers.  *Id*.  In May 1999, Johnson reported pain on the left side of his neck radiating over the left trapezius as well as left forearm pain radiating into the fourth and fifth fingers.  Tr. at p. 142.  Due to the duration and severity of Johnson's symptoms, Dr. Robinson ordered electrodiagnostic studies be conducted to rule out left cubital tunnel syndrome.  Tr. at p. 142.  On June 7, 1999, an Electromyographic/Nerve Conduction Velocity Study (EMG/NCV) was conducted

---

[7] Hyperesthesia is a distortion of the sense "consisting of increased sensitivity, particularly a painful sensation from a normally painless touch stimulus."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 793 (28th ed. 1994).

[8] Tinel's sign is a "tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.  Called also formication s[ign] and distal tingling on percussion."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1527 (28th ed. 1994).

[9] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1234 (28th ed. 1994).

and, as read by Dr. Saad Sobhy, the results were consistent with cubital tunnel syndrome.  Tr. at pp. 156-57.  Thereafter, on July 15, 1999, Dr. Robinson recommended proceeding with anterior transposition of the ulnar nerve, to which Johnson assented; the anterior transposition was completed on February 8, 2000.  Tr. at p. 166.  Dr. Robinson conducted several post-operation examinations wherein satisfactory progress was consistently noted.  Tr. at pp. 148-50.  By April 27, 2000, Johnson reported steady improvement of his arm and indicated a return of sensation in the ulnar side of his hand, though he still experienced slight decrease of sensation in his left fourth and fifth fingers as compared to the right.  Tr. at p. 151.  At a physical exam, conducted by Dr. Kalyani Ganesh, Johnson reported he "suffered a pinched nerve to the left elbow which has been surgically corrected."  Tr. at p. 168.  Upon examination, Dr. Ganesh reported Johnson could "hold a large object, pick up and manipulate a coin, write with a pen, button a button, open a cap, zip a zipper. Intrinsics, grasp, handshake, grip and pinch grip are 5/5 bilaterally."  Tr. at p. 169.  Tinel's sign was negative bilaterally.  *Id*.

As stated above, in order for an impairment to be considered severe at Step Two, it must significantly limit a claimant's ability to do basic work activities.  In accordance with the medical evidence recited above, substantial evidence indicates that Johnson's hand impairment does not significantly limit his ability to do basic work activities.  Accordingly, the ALJ committed no error in failing to find Johnson's cubital tunnel syndrome to be a severe impairment.  Since, at Step 2 of the sequential disability evaluation the ALJ applied the correct legal principles and substantial evidence supports such findings, we recommend that Plaintiff's request for remand on this basis be **denied**.

### 2.  The Listings in Appendix 1 (Step Three)

In Step Three of the sequential disability evaluation process, the ALJ determines whether the claimant's conditions meet or equal the requirements for any impairment listed in Part 404 of the Social Security Regulations, Subpart P, Appendix 1. "The Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity."[10]  20 C.F.R. § 404.1525(a). The medical criteria set for listed impairments are generally at a "higher level of severity than the statutory standard." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (noting that the listings were intended to "operate as a presumption of disability" wherein no further inquiry takes place if a condition meets or equals such listing). If a claimant's impairment or combination of impairments meets or equals a listed impairment, "he or she is conclusively presumed to be disabled" without considering the claimant's age, education, or work experience, thus ending the evaluation process. *Dixon v. Shalala*, 54 F.3d at 1022.

At Step Three, ALJ Medicis determined that Johnson's severe back impairment was not of the severity that met or was substantially equivalent to those listed in 20 C.F.R. Part 404 , Subpart P, Appendix 1. Tr. at p. 15. Johnson asserts this finding was erroneous. Dkt. No. 8 at pp. 14-17. In support of this contention, Johnson alleges he has a spinal disorder of the severity listed under § 1.04 of Appendix. Listing § 1.04 states:

> *Disorders of the Spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With
>> A. Evidence of nerve root compression characterized by neuro-anatomic

---

[10] The major body systems include the musculoskeletal system, special senses and speech, respiratory system, cardiovascular system, digestive system, genito-urinary system, hemic and lymphatic system, skin, endocrine system, multiple body systems, neurological, mental disorders, malignant neoplastic diseases, and most recently added, the immune system. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04(A).

Plaintiff's argument is three-fold: first, Plaintiff reiterates that the ALJ mis-stated his diagnosis as degenerative disc disease instead of herniated disc; second, Plaintiff asserts his herniated disc, a condition specifically referred to in Listing § 1.04(A), does meet and/or equals the severity described in § 1.04(A), and; third, Plaintiff claims the ALJ was required to, but did not, obtain an updated opinion from a medical expert as to medical equivalence.

In Step Three, the burden is on the plaintiff to present medical findings which show that his or her impairments match a Listing or are equal in severity to a Listed Impairment. *Zwick v. Apfel*, 1998 WL 426800, at *6 (S.D.N.Y. July 27, 1998). In order to show that an impairment matches a Listing, the claimant must show that his or her impairment meets all of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. at 530; 20 C.F.R. § 404.1525(d). The fact that a claimant has a "diagnosis" of a Listed Impairment is insufficient, the claimant must also have the findings shown in the Listing of such impairment. 20 C.F.R. § 404.1525(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify. *Sullivan v. Zebley*, 493 U.S. at 530. To make this showing, the claimant must present medical findings equal in severity to all requirements which are supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b). Furthermore, the medical reports should reflect physical limitations based upon actual observations and not just the claimant's subjective complaints. *Id.*

In assessing Johnson's claimed errors, we begin by reciting the relevant medical evidence.

*-13-*

Plaintiff's low back pain began in February 1995 after he slipped on some ice while at work.  On November 5, 1996, just one day after his alleged onset disability date, Johnson was examined by Dr. Saad Sobhy.  Tr. at p. 105.  At the examination, Dr. Sobhy reviewed an x-ray of Johnson's lumbosacral spine that was conducted on August 6, 1996.  *Id*.  According to Dr. Sobhy, the x-rays showed degenerative disc disease at L5-S1 level with a "possible pars defect involving the right L5 pars interarticularis."  *Id*.  Dr. Sobhy also reviewed an MRI of Johnson's lumbar spine, conducted on September 17, 1996, which showed degenerative disc disease with osteophytes at L5-S1. Further, there was "associated concentric disc bulge," minimally asymmetric to the left, and the disc bulge and degenerative changes caused narrowing of both neural exit foramina at the L5-S1.  *Id*. Dr. Sobhy indicated that the left exiting L5 nerve root could be slightly compressed.  *Id*.  Upon physical examination, Dr. Sobhy observed the following.  Johnson had appropriate posture.  There was no evidence of asymmetry or muscular atrophy.  Johnson could tiptoe, heel walk, and squat without difficulty.  Lumbar spine range of motion was "slightly limited in all planes secondary to pain inhibition."  Johnson's muscle strength was 5/5 for all muscle groups.  Sensations were reduced over the left L5 and S1 nerve distributions.  Straight leg raising was negative to 80° bilaterally.  Dr. Sobhy stated that electrodiagnostic studies would be necessary to assess neurological involvement.  Johnson then received a series of epidural shots, which he reported were only helpful to an extent in that he still experienced pain.  Tr. at pp. 102, 105-10, 112-14, 116, & 119-21.  On August 15, 1997, upon referral from Dr. Sobhy, Johnson was examined by Dr. Glenn Axelrod to explore surgical options.  Tr. at pp. 102 & 111.  Dr. Axelrod noted on physical examination that Johnson did not have an antalgic gait but had difficulty getting on his toes and on his heel due to pain.  Tr. at p. 102.  Dr. Axelrod noted this limitation was not due to weakness

because his muscle strength was normal.  *Id*.  Reflexes and sensation were also reported as normal.

*Id*.  Johnson exhibited limited back motion with low back tenderness on the left side.  *Id*.  Since the

epidural injections appeared to have limited results, Dr. Axelrod then referred Johnson to Dr.

Stephen Robinson for a surgical consult.  *Id*.

Thereafter, on September 8, 1997, Johnson was examined by Dr. Robinson.  Tr. at p. 122.

Dr. Robinson noted tenderness in Johnson's lumbar spine with forward flexion as fingertips to

knees.  *Id*.  Leg raising was 90° on the right with low back pain only and 90° on the left with mild

sciatica to the calf.[11]  Johnson also had full motor and sensory function in both lower extremities.

*Id*.  At the time of this examination, Dr. Robinson had not yet reviewed Johnson's MRI scans.  His

initial impression, was "chronic lumbar radicular syndrome secondary to degenerative disc disease

and joint disease and questionable lateral recess stenosis."[12]  *Id*.  Dr. Robinson scheduled another

examination one week later in order to obtain the MRI results for his personal review, obtain the x-

rays, and also for Johnson to get flexion-extension lateral x-rays of the lumbar spine.  *Id*.  One week

later, after personally reviewing the medical diagnostic exam results, Dr. Robinson noted that

Johnson's lumbar spine films revealed "rather advanced degenerative disc and joint disease L-5, S-

1 level" and his flexion/extension films revealed "essentially no motion at L-5, S-1 and 12 deg[rees]

of tilting at 4, 5."  Tr. at p. 123.  Dr. Robinson further noted that Johnson' MRI scan revealed

foraminal stenosis bilaterally at L-5, S-1.  *Id*.  Dr. Robinson then altered his initial impression to

---

[11] Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect, and most commonly caused by protrusion of a low lumbar intervertebral disk; the term is also used to refer to pain anywhere along the course of the sciatic nerve."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1493 (28th ed. 1994).

[12] Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina [opening or passage] of the lumbar spine caused by encroachment of bone upon the space."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1576 (28th ed. 1994).

"[c]hronic lumbar radicular syndrome, secondary to L-5, S-1 herniated disc, lateral stenosis and degenerative disc and joint disease." *Id*.  After discussing the various options with Dr. Robinson, Johnson decided he wanted to proceed with a laminectomy discectomy and approval was sought from the Worker's Compensation Board.  Tr. at pp. 123-26.  Johnson continued to meet with Dr. Robinson for follow-up examinations.  Approval for surgery was requested a third time after a January 18, 1998 appointment with Dr. Robinson, wherein Johnson reported low back pain and pain primarily in his left leg which is constant and aggravated by standing and walking.  Tr. at p. 126.  At that visit, Johnson also reported some hyperesthesias in his left leg and L5-S1 dermatomes.[13]  Dr. Robinson's impression was "[c]hronic lumbar radicular syndrome secondary to lateral recess stenosis."  *Id*.  He further noted that Johnson had degenerative disc disease and mild instability at L4-5 as well as nerve studies documenting chronic left L5 radiculopathy.[14]

   On March 30, 1998, Johnson was consultatively examined by Dr. Reinhard Bothe, an independent medical examiner, in the Workers' Compensation Board context.  Tr. at pp. 131-35.  Dr. Bothe diagnosed Johnson with degenerative disc disease at L5-S1 with radiculitis into the left lower extremity.  Tr. at p. 131.  Dr. Bothe acknowledged Johnson had received prolonged conservative treatment and that surgery was indicated, however, the type of surgery to be performed was still an open question based upon some discrepancies in the file and that an MRI should be conducted to resolved the discrepancy.[15]  Tr. at pp. 131-32.  In conducting his examination and

---

[13] Dermatome, in this context, refers to "the area of skin supplied with afferent nerve fibers by a singly posterior spinal root; called also *dermatomic area*."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 449 (28th ed. 1994).

[14] Radiculopathy is a disease of the nerve roots.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1404 (28th ed. 1994).

[15] The discrepancy revolved around Dr. Sobhy's electrodiagnostic studies and the radiological findings.

making assessments, Dr. Bothe states that he did not have the benefit of any x-rays nor were there

any reports in Johnson's file regarding previous MRI studies.  Tr. at p. 135.  Upon examining

Johnson's lower extremities, Dr. Bothe noted that manual muscle testing against resistance did not

reveal any muscle weakness.  Tr. at p. 134.  Further, all deep tendon reflexes were present and equal

and sensation to pin prick was normal.  *Id*.  Dr. Bothe's notes further indicate that

> [s]traight leg raising in the sitting position to 70 degrees on the right causes pain in the
> left lower back.  During straight leg raising to 70 degrees on the left, he also feels pain
> in the lower left back.  This reversal pain pattern is often related to an impinged nerve.
> [Johnson] refused to raise his legs in the lying position.  He was afraid that it would pull
> too much in his lower back.

Tr. at pp. 134-35.

On April 15, 1998, an MRI of Johnson's lumbar spine was conducted, which indicated

degenerative disc disease at L5-S1 level with interposed disc bulge between osteophytes.  Tr. at p.

128.  There was no definite compression of exiting nerves, though the left neural exit foramina was

slightly narrowed.  *Id*.  When compared to a prior MRI, conducted on September 16, 1996, the

findings were assessed to be "stable" and had not progressed.  *Id*.  A new finding of broad based

disc herniation flattening the thecral sac was noted at L2-3; there was no compression, however, of

the exiting nerves.  *Id*.  In reviewing the MRI, Dr. Robinson opined, on May 11, 1998, that

Johnson's past nerve studies indicated L-5 radiculopathy on the left and that it could stem from

stenosis.  Tr. at p. 130.  At that point, it was decided that another series of epidural blocks would be

tried to alleviate Plaintiff's pain and other symptoms; these blocks were administered in June,

August, and November of 1998.  Tr. at 112, 114, 116, & 130.  On October 13, 1998, Johnson

reported to Dr. Sobhy, who had administered the epidural blocks, that he could not tolerate

Amitriptyline or Zoloft and the blocks were helpful but only for three to four weeks at a time.  Tr. at

p. 115.  Dr. Sobhy scheduled Johnson's final epidural block and referred him back to Dr. Robinson

*-17-*

to again discuss surgical options.  *Id.*

On January 5, 1999, Johnson suffered injuries to his cervical spine when he was involved in a motor vehicle accident.  Thereafter, most of his office visits centered around problems with his cervical spine and/or cubital tunnel syndrome, however, a couple of office visits did concern his continued back pain.  *See* Tr. at pp. 138-50.  On February 12, 1999, Dr. Axelrod examined Johnson and noted normal neurologic exam of both upper extremities including sensation, motor strength, and reflexes.  Tr. at p. 138.  On June 7, 1999, Dr. Sobhy examined Johnson and noted that a musculoskeletal evaluation showed his posture to be appropriate and his gait was normal.  Tr. at p. 154.  Dr. Sobhy further noted that Johnson's muscle tone was normal, without rigidity, spasticity, or atrophy, and strength for all muscle groups was 5/5 bilaterally.  *Id.*  Evaluation of the spine did not show any "asymmetry, crepitation, erythema or effusion" and range of motion of the spine and upper extremities was normal.  *Id.*  On August 12, 1999, Johnson complained to Dr. Robinson about his continual low back and left leg pain, which radiated down to his knee.  Tr. at 145.  Plaintiff indicated his willingness to continue another series of epidural injections which Dr. Robinson found to be a reasonable approach.  *Id.*

On July 8, 1999, Plaintiff underwent a consultative examination by Dr. William D. Ferraraccio, an independent medical examiner, in the course of Johnson's Workers' Compensation claim.  Tr. at pp. 185-89.  Upon physical examination, Dr. Ferraraccio noted tenderness to palpation at the base of the spine in the midline.  Tr. at p. 187.  Mild sciatic notch tenderness was indicated on the left, but not the right.  *Id.*  Johnson exhibited limitation of both forward flexion and extension as well as lateral bending to both the left and the right, with some reactive muscle spasm.  *Id.*  Straight leg raising was reported as "generally unremarkable" at 90° elevation on the right and, on the left

there was some lower back and radicular pain at about 65° of elevation with a positive nerve stretch test.  *Id.*

On March 24, 2000, Dr. Kalyani Ganesh consultatively examined Johnson, as elicited by the Social Security Administration.  Tr. at pp. 168-70.  Upon examination, Dr. Ganesh observed Johnson's gait to be normal.  Tr. at p. 169.  Johnson stated he could not walk on his heels, but he was able to walk on his toes.  *Id.*  Johnson did not need any assistance getting on and off the examining table nor did he require any assistance changing for the examination.  *Id.*  Upon examination of the upper extremities, Johnson's biceps and triceps muscle strength was noted at 5/5 bilaterally and no muscle atrophy or sensory abnormality in the upper extremities was noted.  *Id.* Upon examination of the spine, Dr. Ganesh noted flexion and lateral flexion was 15° while extension was full.  Tr. at p. 170.  Rotation was limited by pain, though no tenderness nor spasm was indicated nor was sciatic notch tenderness.  *Id.*  Straight leg raising was negative bilaterally. Lasegue's[16] sign was negative bilaterally.  *Id.*  Major muscle strength was 5/5 bilaterally and there was no indication of atrophy, motor, or sensory abnormalities of the lower extremities.  *Id.*  Dr. Ganesh futher noted that Johnson's overall cooperation was "poor" and that he was unable to comment on functional capacity, though he did not observe any gross difficulties to sitting, standing, walking or climbing.  *Id.*

In addressing Plaintiff's first claim of error as to the ALJ's improper statement of diagnosis, we note that, as with Step Two, the particular diagnosis of an impairment is not what guides the Agency's decision at Step Three, rather, it is the particular symptoms and medical criteria in the Listings that are to be considered.  20 C.F.R. § 404.1525(d) ("We will not consider your impairment

---

[16] Lasegue's sign is an indication of sciatica where "flexion of the hip is painful when the knee is extended, but painless when the knee is flexed."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1524 (28th ed. 1994).

to be one listed in appendix 1 solely because it has the diagnosis of a listed impairment.  It must

also have the findings shown in the Listing of that impairment.").  We acknowledge that the ALJ

failed to point to a particular Listing in making his determination at Step Three, and instead, merely

stated

> The medical evidence indicates that the claimant has degenerative disc disease at L5-S1,
> an impairment that is severe within the meaning of the Regulations but not severe
> enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart
> P, Regulations No. 4.

Tr. at p. 15.

Such conclusory statements would ordinarily be inadequate for our review in that, not only did the

ALJ fail to point to a specific listing he considered, but also because he failed to point to any

specific criteria for which the claimant failed to meet.  However, we may easily deduce, as have the

parties herein, that the ALJ compared Johnson's back impairment to Listing § 1.04(A).  Though the

ALJ failed to set forth his rationale in support of his conclusion, "the absence of an express

rationale does not prevent us from upholding the ALJ's determination regarding [Johnson's]

claimed listed impairment[], since portions of the ALJ's decision and the evidence before him

indicate that his conclusion was supported by substantial evidence."  *Berry v. Schweiker*, 675 F.2d

464, 468 (2d Cir. 1982); *see also Uhlig v. Apfel*, 1999 WL 350862, at *6 (S.D.N.Y. June 2, 1999)

(citing *Berry*).  Specifically, there is substantial evidence in the record supporting the ALJ's

conclusion that Johnson's back impairment does not meet the criteria in Listing § 1.04(A).  As

indicated above, Johnson was consistently reported as maintaining full motor strength in his lower

extremities and there is no evidence of lower extremity muscle atrophy or muscle weakness.  For

the ALJ to find Johnson met a Listed Impairment, Johnson must present evidence that his

impairment matches all of the specified medical criteria.  *See Sullivan v. Zebley*, 493 U.S. at 530

("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified

medical criteria.  An impairment that manifests only some of those criteria, no matter how severely,

does not qualify." (emphasis in original) (citation omitted)).  Johnson's contentions focus only on

the criteria of nerve root compression, limitation of motion in the spine, sensory loss, and positive

straight leg raising for which the medical evidence supports; he fails, however, to point to any

medical evidence exhibiting the listed criteria of motor loss, atrophy, or muscle weakness.  Dkt. No.

8 at p. 15.  Since no muscle atrophy nor weakness is indicated, it cannot be said that the ALJ erred

in his determination that Johnson's back impairment did not meet a Listed Impairment.

Turning now to Plaintiff's third proffer in support of his contention that the ALJ erred at

Step Three, the Court finds some clarification is necessary as to the rules regarding determination of

medical equivalence.  Pursuant to the Regulations, if a claimant has a medically determinable

impairment that does not meet the requirements of a specific listing, the Agency must consider

medical equivalence.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(H)(4).  In determining whether a

claimant's impairment is medically equivalent to a Listed Impairment, the Agency considers

whether the "medical findings are at least equal in severity and duration to the listed findings."  20

C.F.R. § 404.1526(a); *see also Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999) (citing, *inter alia*,

*Sullivan v. Zebley*, 493 U.S. at 531).  The medical equivalence determination includes consideration

of medical evidence, such as a claimant's symptoms, signs, and laboratory findings; the Agency

does not consider, at this stage, vocational factors such as age, education, or past work experience.

*Id*.  "[L]ongstanding policy requires that the judgment of a physician . . . designated by the

Commissioner on the issue of equivalence on the evidence before the administrative law judge or

the Appeals Council must be received into the record as expert opinion evidence and given

appropriate weight."  S.S.R. 96-6p, 1996 WL 374180, at *3, *Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence* (S.S.A. 1996).  Social Security Ruling 96-6p provides that the "signature of a State agency medical . . . consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  *Id*.  And, when an ALJ determines that an impairment is not "equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied" by the above-mentioned document.  *Id*.

In this case, equivalency considerations were confirmed by Dr. Sury Putcha's signature on the Disability Determination and Transmittal Form, dated April 6, 2000 (Tr. at p. 35), and that of Dr. D.R. Manley, who signed a separate form on June 7, 2000 (Tr. at p. 36).  *See* Tr. at p. 179 (Dr. Manley's affirmation of Dr. Putcha's prior physical assessment).  Plaintiff argues that an updated medical opinion as to equivalence should have been obtained due to the fact that additional evidence was received after June 7, 2005, and that such evidence could have affected the opinion of the medical review consultant.[17]  *See* Tr. at pp. 3 & 181-89 (exhibits received at and subsequent to the hearing).  Social Security Ruling 96-6p cites two additional circumstances upon which an updated medical opinion is required:

---

[17] As Defendant correctly notes, Plaintiff mistakenly attributes the date of the disability examiner's signature, which was May 25, 2000, to Dr. Manley, who affirmed Dr. Putcha's findings on June 7, 2000.  *Compare* Tr. at p. 35 *with* Tr. at p. 36.  Such mistake does not in any way alter Plaintiff's argument regarding the mandate of an updated expert opinion.

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

S.S.R. 96-6p, 1996 WL 374180, at *3-4.

As the Defendant readily concedes, "[b]oth conditions require the ALJ to express an opinion that either the current medical evidence suggests medical equivalence, or that additional medical evidence received would alter the State agency medical consultant's finding.  The ALJ in this case did not express either opinion." Dkt. No. 9 at p. 13.  Instead, the ALJ states in conclusory fashion, as indicated above, that Johnson's impairment does not medically equal any Listed Impairment. "[A]n ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Prentice v. Apfel*, 1998 WL 166849, at *3 (N.D.N.Y. 1998) (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)); *see also Polidoro v. Apfel*, 1999 WL 203350, at *7 (S.D.N.Y. Apr. 12, 1999) (quoted in *Ramos v. Barnhart*, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003) ("The ALJ's failure to mention [certain relevant] evidence and set forth the reasons for his conclusions with sufficient specificity hinders the ability of a reviewing court to decide whether his determination is supported by substantial evidence.")).  Whereas above we found that the ALJ's conclusory statement as to whether Johnson's impairment met a specific listing was nevertheless reviewable, we find that in terms of medical equivalence, the ALJ's failure to elaborate and state an opinion as to the effect the new evidence would have on the expert opinions renders his equivalence determination unreviewable by this Court as any determination would necessarily require this Court to assert facts

and express medical opinions, actions clearly beyond our jurisdiction.  *See, e.g.*, *Kyle v. Apfel*, 99 F. Supp. 2d 227, 232 (D. Conn. 2000) ("The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner.") (citing *Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993)); *see also Sec. and Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (noting that the administrative agency must state grounds for its decisions and that if such grounds are inadequate or improper, a reviewing court "is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis").  The ALJ's failure to explain the reasons for his determinations is a ground for reversal.  Even if the District Court were to reject this finding, the ALJ committed other errors in the sequential evaluation, namely, failing to give controlling weight to Johnson's treating physician in accordance with the Treating Physician Rule, as explained more fully below.

### 3.  Treating Physician Rule

Before evaluating the ALJ's assessments at Steps Four and Five, we address Johnson's contention that the ALJ did not give proper deference to his treating physicians' opinions and instead gave controlling weight to one-time examining consultant Dr. Ganesh and the non-examining review physicians' opinions. Dkt. No. 8 at pp. 17-19.  Plaintiff argues that Drs. Robinson, Sobhy, Axelrod, Bothe, and Ferraraccio each rendered medical opinions based upon their review of the entire medical record, including the MRI and EMG results, whereas, Dr. Ganesh did not have the entire record, nor did he have the MRI or EMG results prior to offering his opinion. We agree with the Plaintiff and find that the ALJ committed legal error when he, without adequate explanation, incorrectly applied the Treating Physician Rule.

Under the Regulations, a treating physician's opinion as to the nature and severity of a

claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

substantial evidence in [the] case record[.]"  20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan*,

168 F.3d 72, 78-79 (2d Cir. 1999).  A "treating physician" is the claimant's "own physician,

osteopath or psychologist (including outpatient clinic and health maintenance organization) who has

provided the individual with medical treatment or evaluation, <u>and</u> who has or had an ongoing

treatment and physician-patient relationship with the individual."  *Jones v. Apfel*, 66 F. Supp. 2d

518, 524-25 (S.D.N.Y. 1999) (emphasis added) (quoting *Schisler v. Bowen*, 851 F.2d 43, 47 (2d

Cir. 1988)); *see generally* 20 C.F.R. §§ 404.1513 & 404.1527.  While the Treating Physician Rule

dictates deference regarding the nature and severity of a claimant's impairments, "[a] treating

physician's statement that the claimant is disabled cannot itself be determinative."  *Snell v. Apfel*,

177 F.3d 128, 133 (2d Cir. 1999); *see also* 20 C.F.R. § 404.1527(e)(1) (Commissioner provides the

ultimate decision on disability).

It is not contested that Dr. Robinson is Johnson's treating physician; what is contested,

however, is the proper weight that should be given to his medical assessments.  In his written

opinion, ALJ Medicis stated:

> Although Dr. Robinson is the claimant's treating physician, his opinion is given less
> weight than that of Dr. Ganesh and the review physician's opinions.  For their opinions
> are consistent with the other findings of the remainder of the medical evidence.  Dr.
> Robinson's opinion indicates total disability but does not indicate specific limitations.
> When Dr. Robinson was asked to provide such an assessment of the claimant's abilities,
> he refused.

Tr. at p. 18.

In analyzing a treating physician's opinion, "the ALJ cannot arbitrarily substitute his [or her] own

judgment for competent medical opinion."  *McBrayer v. Sec'y of Health and Human Servs.*, 712

F.2d 795, 799 (2d Cir. 1983); *see also Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998)

(quoting *McBrayer*).  Furthermore, when weighing all medical opinions and assessing what weight

to accord, "[t]he duration of a patient-physician relationship, the reasoning accompanying the

opinion, the opinion's consistency with other evidence, and the physician's specialization or lack

thereof" are considerations.  *Schisler v. Sullivan*, 3 F.3d at 568; 20 C.F.R. §§ 404.1527(d)(1)-(6);

*see also Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998).  In the event the ALJ does not give

controlling weight to the treating physician, he must specifically state the reasons for doing so.  20

C.F.R. § 404.1527(d)(2).

Here, the ALJ failed to specify his reasons for disregarding Dr. Robinson's opinions as to

the severity of Johnson's impairments.  Instead, he merely relies on Dr. Robinson's failure to

complete a functional capacity assessment as grounds for ignoring the multitude of opinions

rendered during the course of treatment, including, for example, the multitude of tests conducted as

to range of motion and the numerous discussions Dr. Robinson had with regard to the necessity of

surgery.  Nor does the ALJ specify how Dr. Robinson's assessments are inconsistent with not only

the medical record but also other evidence in the record.  The ALJ's reliance on Dr. Ganesh over

that of Dr. Robinson was error.  Dr. Ganesh examined Plaintiff on March 24, 2000.  In his report,

Dr. Ganesh stated that he was unable to comment on functional capacity aside from his observation

that Johnson did not have any "gross difficulties to sitting, standing, walking or climbing."  Tr. at p.

170.  It appears that the only diagnostic evidence Dr. Ganesh had in making his assessment was an

x-ray of Johnson's lumbar spine, taken on March 24, 2000.  No where in Dr. Ganesh's report is

reference made to the multiple MRIs Johnson underwent.  In light of the Treating Physician Rule

and the fact that Dr. Ganesh did not review the entire medical record and himself acknowledged

that a functional capacity assessment could not be made, the ALJ's decision to not accord controlling weight cannot be reconciled.  On the one hand, the ALJ disregarded Dr. Robinson's opinions under the justification that Dr. Robinson allegedly declined to provide a capacity assessment, while, on the other hand, the ALJ gave controlling weight to Dr. Ganesh who himself declined to give a capacity assessment.  Furthermore, as indicated above in our recitation of the medical evidence, it is clear that Dr. Robinson's opinions are consistent with not only the acceptable clinical and laboratory diagnostic techniques but also with the opinions of Drs. Sobhy, Axelrod, Bothe, and Ferraraccio, Plaintiff's other treating physicians and Worker Compensation Consultants.  Furthermore, while it may be true that Dr. Robinson declined to complete a capacity assessment, the ALJ failed to address the numerous examinations Dr. Robinson conducted wherein he states range of motion and other testing results.  "It is well settled that, even when the claimant is represented by counsel, the ALJ has an affirmative duty to develop the medical record and seek out further information where physician's reports are inconsistent and where gaps exist in the record." *Peterson v. Barnhart*, 219 F. Supp. 2d 491, 494-95 (S.D.N.Y. 2002) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)).  ALJ Medicis's failure to follow the Treating Physician Rule constitutes a failure to apply the proper legal standard and is grounds for reversal.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

### E.  Reverse or Remand

In determining the final disposition of this matter, the most equitable judgment must be implemented.  The court has authority to reverse with or without remand.  42 U.S.C. § 405(g).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Sobolewski v. Apfel*, 985 F. Supp.

300, 314 (E.D.N.Y. 1997) ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.") (cited in *Rosa v. Callahan*, 168 F.3d at 82-83).  Reversal is appropriate, however, when there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  *Parker v. Harris*, 626 F.2d at 235; *see also Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) ("Where, however, the reversal 'is based solely on the [Commissioner's] failure to sustain her burden of adducing evidence of the claimant's capability of gainful employment and the [Commissioner's] finding that the claimant can engage in sedentary work is not supported by substantial evidence, no purpose would be served by [the court] remanding the case for rehearing." (citing *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998)); *Rosa v. Callahan*, 168 F.3d at 83 (remand solely for calculation of benefits is warranted when the court has no "apparent basis to conclude that a more complete record might support the Commissioner's decision"); *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992).

"Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally . . . remand the matter to the Commissioner for further consideration."  *Curry v. Apfel*, 209 F.3d at 124.

Accordingly, because the ALJ failed to adequately develop the record in reaching a determination as to the medical equivalency of Plaintiff's impairment and in failing to apply the Treating Physician Rule, the Court need not – indeed, cannot – reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.  The case should be remanded to the Commissioner to further develop the record.

**WHEREFORE**, it is hereby

**RECOMMENDED** that the Commissioner's decision denying disability benefits be

**REVERSED and REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. §

405(g); and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y*

*of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R.

CIV. P. 72, 6(a), & 6(e).


IT IS SO ORDERED.

Dated: November 28, 2005
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge